Complainants, surviving trustees named in a deed of trust executed by Henry D. Moore (now deceased) on May 10th, 1918, seek a construction thereof and a determination by the court of the rights of various parties who are asserting conflicting claims to trust income. These claims stem from several attempted alienations of income by beneficiaries and are questioned because the settlor included in the deed of trust a provision against anticipation.
The trust was established by the settlor primarily for the benefit of four of his grandchildren, the children of his deceased son Gilbert H. Moore. These grandchildren, who are *Page 316 
all living, were to receive most of the trust income during their respective lives. However, the trust indenture directed that the income from a certain portion of the corpus be used by the trustees to augment income which would be paid to them from the estate of Gilbert H. Moore so that "until July 12th, A.D. 1920," each grandchild annually received the sum of $1,500, and their mother Ada V. Graw (formerly Moore) annually received the sum of $4,800, "for the maintenance of the family home."
July 9th, 1920, the four grandchildren executed an agreement in which they referred to the then impending distribution of a portion of the trust corpus, and the fact that, as of July 12th, 1920, the annuity to their mother for the maintenance of the family home would cease; they declared it to be their desire that the annual payment to their mother continue and, to that end, they each assigned to her "so much of the income that may be due and payable to each of us under said deed of trust mentioned above as shall be necessary to make payment to the said Ada V. Graw of the sum of $1,200 annually (making a total of $4,800) it being understood, however, that the amount paid in any year under this assignment out of the income of any one of the parties hereto shall not exceed $1,200."
From July 12th, 1920, until April 15th, 1941, the trustees annually deducted $1,200 from the income payable to each of the four beneficiary-assignors and paid $4,800 to Ada V. Graw. On the latter date one of the beneficiaries, Robert W. Moore, delivered to the trustees a written revocation of his assignment. Since the receipt of that writing, the trustees have paid no moneys to Mrs. Graw from out his income. He now takes the position that his assignment of income to Mrs. Graw was illegal because prohibited by the trust indenture. The other beneficiaries assert that the assignments of income to their mother were permissible and that they are irrevocable.
The next controversial question grows out of an agreement, respecting future trust income, which was embodied in a decree of this court. Robert W. Moore has been married *Page 317 
several times. One of his wives was Mary Arndt Moore, now Mary Arndt Moore Rahming, and the defendant Mary Patricia Moore was born of their marriage. On November 5th, 1934, Mary Arndt Moore obtained a final decree of divorce from Robert W. Moore, and on March 1st, 1940, she instituted proceedings in this court (docket 133, page 366) to compel him to provide suitable support and maintenance for his said child. November 29th, 1941, a written agreement was entered into between Robert W. Moore and Mrs. Rahming in which, among other things, he agreed to pay her $50 per month for the maintenance, education and support of his daughter. The agreement also read that these payments should be a charge upon, a lien against, and payable from any and all moneys due or to grow due to him from the trustees of the trust. By decree dated December 23d 1941, this court approved said contract as fair, equitable and just, ordered the parties to perform the covenants and agreements contained therein, and directed the trustees, beginning January 15th, 1942, to make said payments out of trust income due and to grow due Mr. Moore. Said decree also contained a provision that it should be a present and continuing lien on such income and on all his right, title and interest in, to and under the trust instrument. Mr. Moore has never attempted to revoke his agreement and the trustees have made the payments called for therein.
In addition to the assignment of income to his mother, and the agreement made with Mrs. Rahming for the support of Mary Patricia Moore, Robert W. Moore caused the following instruments, signed by him, to be delivered to the trustees:
November 21st, 1941: A direction to pay $1,200 annually to him from out the trust income to become due him, and to pay all of the balance to his wife, Grace Mary Moore. Also, a power of attorney authorizing his wife to collect the income so directed to be paid to her.
December 23d 1941: A revocation of the above directive and power of attorney.
April 14th, 1942: A directive to reinstate the authorization and appointment of November 21st, 1941. *Page 318 
April 14th, 1942: A directive that moneys due and payable to Robert W. Moore on April 15th, 1942, be paid to Grace Mary Moore, and a declaration that a previous assignment of income to William Stringer, Esq., of Atlantic City, was annulled and was to be ignored by the trustee.
February 4th, 1943: A revocation of the directive and appointment of November 21st, 1941, and a revocation of the reinstatement and of the directive of April 14th, 1942.
May 25th, 1943: A reinstatement of the directive of November 21st, 1941, except the power of attorney in part.
July 9th, 1943: A directive that a portion of the trust income of Robert W. Moore be paid to one Florence E. Marshall in the amounts provided for in an agreement of sale of a dwelling entered into between her, as the seller, and Robert W. Moore and Grace Mary Moore, as the buyers.
The precise question before this court is: Are the several attempted alienations of trust income by beneficiaries void because of the restrictions attached by the trustor to his benefactions? The restrictive clause of the trust instrument reads:
"Any interest which Gilbert H. Moore, Robert W. Moore, Mary Virginia Moore, and Henry D. Moore, 2nd, the children of my deceased son Gilbert H. Moore, or any other person or persons may at time have hereunder shall not in any manner be liable to or for their debts or obligations, and shall not be subject to execution, attachment, garnishment nor anticipation."
A trust created by an instrument which contains a provision restraining alienation or anticipation of the beneficial interest, is generally denominated a "spendthrift trust." The term is purely descriptive however, for to create a spendthrift trust it is not necessary that the beneficiary be a spendthrift, and the validity of the restriction will not be judged by the propriety of the purpose to be served by an alienation or anticipation. Jones v. Harrison (Circuit Court of Appeals,8th), 7 Fed. Rep. 2d 461; writ of certiorari denied,270 U.S. 650; 70 L.Ed. 781; 119 A.L.R. 23; 1 Restatement, Law ofTrusts, § 152; Chelsea-Wheeler Coal Co. v. Marvin (Court ofErrors and Appeals), 134 N.J. Eq. 432, 438; 35 Atl. Rep.
2d 874. *Page 319 
The well established rule of the common law was that a valid trust could not be created which contained a provision that the interest of the life cestui que trust could not be alienated. The English courts held that such a condition attached to a transfer otherwise absolute, was repugnant to the nature of the estate granted. Camden Safe Deposit and Trust Co. v.Schellenger (Court of Chancery), 78 N.J. Eq. 138, 139;78 Atl. Rep. 672.
The theory adopted by most of our courts which have rejected the common law rule has been that "A man should be permitted to accumulate property, to transmit it to others, and to provide against its dissipation by an improvident donee." 1 Scott onTrusts 747 § 152. In the leading American case of BroadwayNational Bank v. Adams, 133 Mass. 170, 172; 43 Am. Rep. 504,507, the court reasoned that an owner of property should be permitted to dispose of it as he wishes so long as third persons are not injured thereby; that the imposing of a restraint on alienation or anticipation by the beneficiary is no injury to his creditors, since but for the benefaction they could not have reached the property, and if they are deceived into extending credit upon reliance of his interest in the trust they have only themselves to blame, since they would not have been deceived if they had examined the record.
Vice-Chancellor Leaming cited and quoted from BroadwayNational Bank v. Adams in Camden Safe Deposit and Trust Co.
v. Schellenger, supra. The Vice-Chancellor suggested that in his opinion restraints against alienation by the life beneficiary of a trust were valid, but remarked that he was not called upon to decide that question. In The Trust Company of New Jersey v.Gardner, 133 N.J. Eq. 436; 32 Atl. Rep. 2d 572, Vice-Chancellor Fielder advised a decree sustaining the validity of a restriction against alienation attached to a testamentary gift of trust income. The Vice-Chancellor reasoned as had the court in Broadway National Bank v. Adams, supra, and, so reasoning, adopted apt words of Vice-Chancellor Berry from the opinion in Girard Trust Co. v. *Page 320 Schmitz, 129 N.J. Eq. 444; 20 Atl. Rep. 2d 21: "`the power to dispose of property by will includes the right to attach to testamentary gifts such terms, conditions, limitations or restrictions as the testator pleases, provided they are not contrary to public policy or forbidden by law. And every presumption will be taken in favor of the validity of conditions and restrictions imposed by a testator.'" The words of restriction in the two wills before Vice-Chancellor Fielder were: "* * * free from any debts, contracts and engagements which she shall have or may enter into." And, "free from any debts, contracts and engagements which she shall have made or subsequently make." In concluding his opinion and referring to the restrictions before him, Vice-Chancellor Fielder said: "They express the wishes and desires of the parents, they do not offend any public policy of the state, are not forbidden by law and are binding on Mrs. Gardner. She has no right or power to enter into any agreement which will defeat them wholly or partially. She cannot make disposition of her interest in the net income of the trusts prior to the time she is entitled to come into possession of such income."
The decision in The Trust Company of New Jersey v. Gardner,supra, was the first reported in this state affirming the validity of spendthrift trusts so far as they concern the right of the cestui que trust to make voluntary disposition of the whole or a part of his interest in anticipation of the time he would be entitled to receive it.
In an earlier case, Wright v. Leupp, 70 N.J. Eq. 130;62 Atl. Rep. 464, Vice-Chancellor Pitney had indicated that in his opinion restrictions against voluntary alienation of trust income by life beneficiaries were valid. He held that an agreement of a life beneficiary assigning a portion of his trust income to his wife for her support and the support of their children did not defeat the intention of the founder of the trust. That intention was clearly expressed: The trustor declared that his beneficiary should not have power to "in any way defeat the intent of this instrument as herein expressed, *Page 321 which is to make provision for the support, maintenance andpersonal comfort of the parties of the first part, free from allliens and claims of creditors." (Italics mine for emphasis.) No appeal was taken from the decree of the Chancellor based upon the opinion of Vice-Chancellor Pitney. It may be noted, however, that the Court of Errors and Appeals had previously had the trust instrument before it in another case, and had declined to pass upon the validity of the restrictive clause. Furniss v. Leupp,69 N.J. Eq. 831; 66 Atl. Rep. 1134.
The intention of the founder of the trust, if it can be ascertained and if it is not contrary to public policy or forbidden by law, must be regarded by the court as the measure by which the validity of the attempted alienation or anticipation shall be determined. The Trust Company of New Jersey v.Gardner, supra.
The intention of the settlor in the present instance seems to me not to be open to doubt. While it is true that he did not choose to employ the word "assignment" in formulating his restrictive clause, he did direct that beneficial interests should "not in any manner be liable to or for" the"obligations" of beneficiaries and specifically directed that they should "not be subject to * * * anticipation." (Italics mine.) Now, the legal significance of the word "anticipation," when used in the spendthrift clause of a trust instrument, has been well established. So employed, anticipation is "used in the present for what is to accrue; dealing with income before it is due." Gray v. Board of School Inspectors, 231 Ill. 63;83 N.E. Rep. 95, 99 (quoting from Anderson's Law Dictionary); King
v. United States (D.C. Mass.), 12 F. Supp. 614, 616;Wilmington Trust Co. v. Wilmington Trust Co. (Del.Ch.),15 Atl. Rep. 2d 665, 668; 3 C.J. 229; 3 C.J., § 1396; 3 Wordsand Phrases, Anticipation, 521. It has been argued here, as it was argued in King v. United States, supra, that the prohibition against anticipation did not negative a power to assign and that, since the power to assign was not specifically negatived, the assignments of beneficial *Page 322 
interests in the trust were valid. To so hold would be to run counter to the expressed intent of the settlor.
In every one of the questioned alienations or assignments of trust income now before the court, a beneficiary attempted to deal with trust income before it was due to be paid to him — before it accrued. That is exactly what the settlor prohibited. And to argue that these attempted alienations or assignments of trust income are valid and irrevocable is to say that beneficial interests have by acts of the beneficiaries become liable for their obligations. This, the settlor declared, should not be brought about "in any manner."
Other factors should be discussed with respect to the agreement of Robert W. Moore to support his daughter Mary Patricia Moore. The answer filed herein on behalf of this infant defendant concludes with the statement: "This defendant contends that the decree of December 23d 1941, aforesaid, is valid and binding, irrespective of the final decree or order that this court may enter in this cause of action."
I am unable to adopt the view that the decree in the suit of Mrs Rahming against Robert W. Moore "is valid and binding" on the trustees irrespective of the final decree or order that this court may make in this cause. And, the fact that the trustees have honored the direction of the decree and have made payments in accordance with its provision, adds nothing to it by way of legal sanction. An examination of the file in the Rahming suit discloses that neither the trustees nor the subject-matter of this suit, the trust, were before the court. The decree there entered was based upon the agreement filed in the cause made between Mrs. Rahming and Mr. Moore, a copy of which agreement was annexed to the decree. The decree adjudged the agreement to be equitable and just and adequate for the protection of the infant. It provided that "the parties to such agreement shall be and they are hereby bound to perform all the covenants and agreements therein made." (Italics mine.) The trustees were not parties to the suit, nor were they parties to the agreement approved and adopted by the court. Obviously, under such circumstances, the decree is ineffective to bind the trustees. *Page 323 
Paragraph three of the decree ordered that "This decree shall be and constitute a present and continuing lien on the income due and to grow due the said defendant, Robert W. Moore, from and under said deed of trust and on all his right, title and interest in, to and under said deed of trust for the payment of the said sum hereafter mentioned and the costs and counsel fees hereinafter allowed." The power of the court, under the circumstances stated, to impose a lien on all the interest of Robert W. Moore in said deed of trust may be open to some question; but it is certain that in such a proceeding the court could not impose upon the interest of any trust beneficiary, a lien which would nullify or supersede a restriction which the trustor had attached to his gift.
Robert W. Moore could not, by agreement with Mrs. Rahming, defeat the restriction; nor could the decree, approving and adopting their agreement, give legal effect to that portion which embraced objects beyond the power of the contracting parties to effectuate. Our courts have, it is true, not infrequently directed that decrees for support stand as liens on the real and personal property of the party directed to pay. Whether or not, however, a lien was impressed by virtue of the decree, upon the income of Robert W. Moore after it accrues is not the point in issue here and I express no opinion thereon. I do hold, however, that the decree is entirely ineffective so far as concerns trustcorpus or income before it becomes payable to the beneficiary.
There is further evidence in the trust instrument of the intent of the founder with respect to an assignment such as was attempted to be made by the four life beneficiaries in favor of their mother. The settlor declared that he had been making an allowance of $4,800 per annum to Mrs. Graw "for the maintenance of the family home." He directed his trustees to continue such arrangement, but only "until July 12th, A.D. 1920." That date was fixed, evidently, because the youngest child of Gilbert H. Moore, deceased, would attain his majority on that day. The intention of the settlor to then terminate maintenance of the family home is further demonstrated *Page 324 
by his direction that on that day there should also be a partial distribution of trust corpus, from the income of which the maintenance moneys were directed to be paid.
It has been argued that I must accept the decision in Wright
v. Leupp, supra, as dispositive of all the issues before me. This argument assumes that Vice-Chancellor Pitney reached his conclusion on some consideration of public policy not mentioned in his opinion. It is contended that as the assignment to Mrs. Graw was to maintain the Moore family home, and the other assignments were to provide a home for Robert W. Moore, the beneficiary, and his wife and his children, and to provide for her and their support, the validity of the assignments must be sustained. The words of Vice-Chancellor Pitney may not be so interpreted. It is true that the spendthrift clause he had before him declared that the beneficiaries should not have power "to anticipate" future trust income. But, that clause concluded with these significant words: "* * * the intent of this instrument as herein expressed, which is to make provision for the support, maintenance and personal comfort of the parties of the first part, free from liens and claims of creditors." (Italics mine.) The assignment, in the special circumstances of that case, did not, Vice-Chancellor Pitney said, "defeat the intention of the instrument." And, as our Court of Errors and Appeals has declared, considerations of public policy in these matters rest within the discretion of the legislature. Hardenburgh v.Blair, 30 N.J. Eq. 645, 667.
The decision in Wright v. Leupp, supra, was not cited or discussed by Vice-Chancellor Fielder in his opinion in The TrustCompany of New Jersey v. Gardner, supra, but the decree made by the Chancellor in the latter case embodied the finding of Vice-Chancellor Fielder that a spendthrift trust was valid and enforceable in this state, particularly against an attempted voluntary alienation of future life income by a cestui quetrust. However, my decision in the present case need not rest solely upon the precedent of that case. In Chelsea-Wheeler CoalCo. v. Marvin, supra, our *Page 325 
Court of Errors and Appeals sustained a clause prohibiting commutation, alienation or assignment of future life insurance installment benefits by the beneficiary. The restrictive words had been inserted by the insured in his designation of the beneficiaries of his life insurance. After his death the beneficiary, a daughter, assumed an obligation of her deceased father and executed an instrument directing the insurance company to forward her monthly insurance payments, as they became due, to the attorneys who represented the creditor. She also gave a written power to the attorneys to receive the insurance checks, to endorse them and to apply the receipts against the debt assumed. Subsequently, the beneficiary revoked this assignment and power of attorney and executed similar instruments in favor of another creditor. This resulted in a suit in this court to restrain payment under the second directive, and to enforce payment under the first. The decree advised sustained the validity of the first directive and the power of attorney. On appeal the decree was reversed. Mr. Justice Colie, speaking for the Court of Errors and Appeals, noted that no decision in New Jersey had been called to the court's attention dealing with the right to restrain alienation of an insurance fund through the medium of the insurance contract. He said: "We think, however, that there is a close analogy between the situation sub judice
and the type of restraint on alienation or assignment found in `spendthrift trusts.'" Also: "On the date when Mrs. Marvin assigned to the complainant `sufficient moneys due to me' there was not then payable to her any installments. It would seem to follow necessarily that the assignment contemplated a present assignment of future installments. If the instrument did not contemplate an assignment of future installments, but only installments then due, it was meaningless since, as stated above, there was then no installment due and unpaid. We will not adopt a construction which renders an instrument meaningless. * * * It seems clear to us that the primary intent of the parties to the contract of insurance was to afford a modest but regular income to the widow *Page 326 
or daughter. Unless the plan adopted was in violation of statute or public policy, it must be upheld. * * * For the reasons stated, we hold that the attempted assignment and the power of attorney are invalid."
Another issue has been tendered in this case. It grows out of a provision of the deed of trust which I have not heretofore discussed. That provision directed that the trust should not terminate until the death of the last survivor of the four grandchildren, that upon the death of each grandchild, his or her share of the income should be paid to his or her surviving spouse and children, and that, upon the termination of the trust the "funds, principal and accumulated interest, if any, shall be divided among such persons as said children may respectively by last will and testament appoint, and in the absence of appointment then as real estate belonging to said children under the laws of New Jersey."
By an amended counter-claim the defendant Robert W. Moore called attention to this provision of the trust instrument and prayed that a child born to his present wife in New York City on August 6th, 1939, be declared to be his child. In his counter-claim he stated that "prior to August 6th, 1939," Mrs. Moore obtained a decree of divorce from one Winthrop Parkhurst in the Republic of Mexico and that, "also prior to August 6th, 1939, this defendant and the said Grace Mary Moore were married in the Republic of Mexico." He also alleged that at the time of the child's birth Winthrop Parkhurst claimed to be the legal husband of the boy's mother, and that, on February 6th, 1941, Mr. Parkhurst obtained a final judgment in divorce from her in the Supreme Court of the State of New York. Furthermore, Mr. Moore alleged that at the time of the birth of the child in New York City said child was registered in the proper public office under the name of "____ Parkhurst, son of Winthrop Parkhurst, whereas in truth and in fact he was and still is the son of this defendant and the defendant, Grace Mary Moore."
At final hearing Robert W. Moore and Grace Mary Moore both testified that the child, now known as Robert W. Moore, *Page 327 
Jr., was their son, born to them of their marriage. Mrs. Moore testified further that when this child was about to be born she boarded an aeroplane and flew from the then home of the parties in California to New York City in order that she might enter a hospital where she had previously given birth to a child by her first husband, Winthrop Parkhurst; that, arrived in New York, she found that she must immediately go to the hospital and, after telephoning her husband in California, contacted her former husband who came to her assistance; that Mr. Parkhurst took her to the hospital; and, that the error in registration occurred because he performed this act of kindness.
It is, of course, important that the parentage of the child known as Robert W. Moore, Jr., be determined. If, in a proper proceeding, he is decreed to be the lawful son of Robert W. Moore then, upon the death of the latter, he might share with his mother and his brothers and sisters in the income from this trust and, "in the absence of appointment" by his father, in one-quarter of the corpus. I feel, however, that this issue has been prematurely tendered. It should be observed, also, that although Winthrop Parkhurst was named as a party defendant to the counter-claim, he was not served with process and no effort seems to have been made to advise him of the pendency of this suit. This omission, in itself, might not have raised an insurmountable obstacle to the determination of the question presented by the counter-claim as we are here interested in matters affecting the trust and the identity of beneficiaries. Other considerations, however, persuade me that the counter-claim should be dismissed. Other children may be born to and survive Robert W. Moore. It is even possible, in view of the known circumstances, to conceive that a child or children might be born to Mr. Moore of another wife. A widow and the next of kin of Robert W. Moore surviving him, the trust deed provides, may share in the income and in the principal of the trust, and I cannot see my way clear to advise a decree affecting possible property rights of children not yet in being. It is suggested that the *Page 328 
testimony of Robert W. Moore was available in this cause but would not be available after the happening of the stated contingency, i.e., his death. But, in a proper proceeding, his testimony may be taken and preserved until all of those who may share in the income and corpus after the happening of that contingency, are known. I shall, therefore, advise a dismissal of the counter-claim.
In consonance with the foregoing opinion, I hold and I advise the complainant trustees that the several attempted alienations or assignments by beneficiaries of anticipated income payments (including the alienation embodied in a decree in the earlier cause) are invalid and ineffectual as such, because contrary to the restrictions attached by the trustor to his gifts. *Page 329